```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW HAMPSHIRE
```

Jessica Newland, et al.

    v.                                         Civil No. 16-cv-547-JL
                                              Opinion No. 2017 DNH 251P

North Country Healthcare, Inc.,
d/b/a Littleton Hospital Association;
Littleton Regional Healthcare and
North Country Women's Health


**MEMORANDUM ORDER**

This discovery dispute arises in the context of a medical negligence and wrongful death case following the traumatic delivery and subsequent death of Prezlie Newland at Littleton Regional Hospital. Her parents, plaintiffs Jessica Newland and Phillip Newland, move the court to compel defendant Littleton's employee, Jessica Upson, to answer deposition questions regarding the conversation she had with her supervisor, Kim Force, following the delivery. At her deposition, Nurse Upson declined to answer questions upon counsel's instruction, on the basis that New Hampshire's "quality-assurance privilege"[1] protects the substance of her conversation with Force from discovery. The substance of that initial conversation, however,

---

[1] N.H. Rev. Stat. Ann. § 151:13-a.

is not itself protected by the quality-assurance privilege.  The court therefore grants the Newlands' motion.

I.  **Applicable legal standard**

Littleton Hospital asserts the quality-assurance privilege over Nurse Upson's communications with Force.  As the party asserting the privilege, Littleton Hospital bears the burden of establishing its application to the communications in question by "set[ting] forth facts sufficient to establish all the elements of the claimed privilege."  In re Grand Jury Proceedings, 183 F.3d 71, 73 (1st Cir. 1999) (discussing burden for establishing psychotherapist-patient privilege); cf. Hampton Police Ass'n, Inc. v. Town of Hampton, 162 N.H. 7, 14 (2011) ("The burden of proving whether information is confidential," and thus protected from New Hampshire's Right-to-Know Law, "rests with the party seeking nondisclosure"); State v. Gordon, 141 N.H. 703, 705 (1997) (burden of proving existence of attorney-client privilege lies with the asserting party).

The quality-assurance privilege is established by N.H. Rev. Stat. Ann. § 151:13-a, II, which provides:

> Records of a hospital committee organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality and testimony by hospital trustees, medical staff, employees, or other committee attendees relating to activities of the quality assurance committee shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena, or admission into

>     evidence in any judicial or administrative proceeding.
>     However, information, documents, or records otherwise
>     available from original sources are not to be construed
>     as immune from discovery or use in any such civil or
>     administrative action merely because they were presented
>     to a quality assurance program, and any person who
>     supplies information or testifies as part of a quality
>     assurance program, or who is a member of a quality
>     assurance program committee, may not be prevented from
>     testifying as to matters within his or her knowledge,
>     but such witness may not be asked about his or her
>     testimony before such program, or opinions formed by him
>     or her, as a result of committee participation.

The statute further clarifies that "records," in this context, include "records of interviews and all reports, statements, minutes, memoranda, charts, statistics, and other documentation generated during the activities of a quality assurance committee," but do not include "original hospital medical records or other records kept relative to any patient in the course of the business of operating a hospital." Id. § 151:13-a, I. The privilege is "to be narrowly construed." In re K, 132 N.H. 4, 13 (1989).

In the sole New Hampshire case addressing the scope of this privilege,[2] a hospital's nurse epidemiologist conducted an

---

[2] In State v. Soucy, 139 N.H. 349, 355 (1995), the New Hampshire Supreme Court addressed the circumstances under which a hospital may waive the privilege. In another case, Judge Barbadoro concluded that a statutory exception prevents the privilege from applying to "litigation challenging a hospital's decision to revoke a physician's staff privileges." Smith v. Alice Peck Day Mem'l Hosp., 148 F.R.D. 51, 55 (D.N.H. 1993). Neither of those cases, however, presented a dispute over whether the

3

investigation into the possible origins of the herpes infection contracted by a patient, "K." In re K, 132 N.H. at 5-6. The investigation "included a test of K's blood, interviews with K's two treating physicians and the head of the maternity nursing unit, and an examination of K's medical record." Id. at 6. The epidemiologist subsequently reported her findings to the "Infections Committee." When the infected patient sought access to the results of the investigation, the hospital denied the request, claiming privilege under § 151:13-a. Agreeing with the hospital, the New Hampshire Supreme Court held that the privilege protected the epidemiologist's report to the Infections Committee, and that committee's minutes. Id. at 5.

The Court concluded that the statutory privilege protects the activities of any hospital committee that fulfills the functions set forth in § 151:13-a, II -- that is, a committee "organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality." Id. at 8-9. Thus, though the hospital may also have organized a more formal "quality-assurance committee," the privileged protected reports to and the minutes of the Infections Committee because it fulfilled that function. Id. at 12-13.

---

communications at issue were protected as being created in connection with the activities of a quality-assurance committee.

At the same time, "[i]ndividual forays into quality assurance are not privileged under the statute . . . ." Id. at 13. The Court articulated a two-part test to determine whether the epidemiologist's activities leading to her report to the committee, "should be treated as a source of privilege for the resulting materials." Id. at 13. Under that rubric, the statute protects records resulting from an employee's investigation when (1) the inquiry is "confined to the object of quality assurance," and (2) the investigator is "authorized to act on the [quality-assurance committee's] behalf." Id. at 13. Because the epidemiologist "was a member of the committee in her own right" and the hospital "expressly 'delegated' immediate responsibility for the performance of the Infections Committee's duties to . . . 'the Nurse Epidemiologist,'" among others, her report was "'generated during the activities of a quality assurance committee'" and, thus, privileged. Id. at 14 (internal citations omitted).

## II. Background

Nurse Upson provided care during Prezlie's birth. At the end of the shift during which Prezlie was delivered, Nurse Upson sought out Force, her supervisor, to discuss the events of the night. As she explained at her deposition, "[t]he next morning I just kind of broke down with her, just to -- how emotional it

was. And I also wanted to just hear someone tell me we did everything we could have."[3] She went on to characterize the conversation as "nurse-to-supervisor discussion in a safe place where I felt I could break down about the night before."[4]

When the Newlands' counsel inquired into the substance of the conversation, the defendants' counsel instructed Nurse Upson not to answer, asserting that the quality-assurance privilege protects the conversation.[5] The Newlands then moved to compel answers to questions regarding the substance of Nurse Upson's conversation with Force, arguing that the conversation is not protected by the privilege because Force was not part of, or acting on behalf of, any quality-assurance committee at Littleton Hospital at the time of the conversation in question.

**III. Analysis**

The question before the court is whether the quality-assurance privilege established by § 151:13-a, II, as interpreted by In re K, protects Nurse Upson's conversation with Force. Littleton Hospital argues that Force was acting on

---

[3] Plaintiffs' Mem. (doc. no. 20-1) at 5 (quoting Upson Dep. 74:9-12).

[4] Id. at 7 (quoting Upson Dep. at 78:19-21).

[5] Id. at 8 (quoting Upson Dep. at 95:1-7).

behalf of the hospital's quality-assurance committee[6] during her conversation with Nurse Upson because she was acting in accordance with the hospital's "Sentinel Event and Root Cause Analysis" policy, rendering that conversation subject to the privilege. The Newlands argue to the contrary, that Nurse Upson's conversation with Force does not fall within the statute's protection for records of quality control committees and "testimony . . . relating to" such a committee's activities, § 151:13-a, II, regardless of whether Force acted in accordance with Littleton Hospital's policy. The court agrees with the Newlands.

The statute provides that only the "[r]ecords of a hospital committee" organized for the purposes outlined in the statute, and "testimony . . . relating to activities of the quality assurance committee shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena, or admission into evidence in any judicial or administrative proceeding." N.H. Rev. Stat. Ann. § 151:13-a, II. In light of their responsibilities set forth in the policy, Littleton Hospital's Quality Committee and Sentinel Event Review

---

[6] Littleton's policy refers to the quality-assurance committee as the "Quality Committee." Obj. Ex. A (doc. no 22-2) ¶ III(I). A second quality-assurance committee, a Sentinel Event Review Team, may also be constituted under certain circumstances. Id. ¶ VI(C), (D).

Teams may constitute committees "organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality," rendering its records and testimony before it protected by the quality-assurance privilege.[7]  Id.

Littleton Hospital asserts that the conversation between Nurse Upson and Force is a record of one or both of these committees in the same sense as the nurse epidemiologist's activities in conducting her independent investigation in In re K.[8]  To establish that the privilege protects this conversation from discovery, Littleton Hospital must demonstrate that the conversation was (1) "confined to the object of quality assurance," and (2) Force was "authorized to act on the [quality-assurance committee's] behalf."  132 N.H. at 13.  Littleton Hospital has satisfied its burden on neither point.

As to the first, the quality-assurance privilege does not protect Nurse Upson's conversation with Force because the

---

[7] See, e.g., Obj. Ex. A (doc. no. 22-2) ¶¶ III(I), IV(C), IV(D), IV(G).  Though the Newlands dispute this point in a single sentence in a footnote in their reply memorandum, see Reply (doc. no. 23) at 3 n.4, the court is satisfied that these committees may, when performing the function of a "quality-assurance committee" as outlined by N.H. Rev. Stat. Ann. § 151:13-a, act as such committees.  The court need not make a definitive determination here, however, because, as discussed infra, Force was not acting on behalf of either committee during the conversation that is the subject of this motion.

[8] See Obj. (doc. no. 22) at 5; Surreply (doc. no. 26) at 2.

8

conversation was not an inquiry "confined to the object of quality assurance." The nurse epidemiologist of In re K affirmatively undertook her investigation after hearing from K's husband, also a hospital employee, about unsanitary conditions present during K's stay at the hospital. Id. at 6-7. That formal inquiry included a blood test, interviews with treating physicians and the head of the maternity nursing unit, and an examination of K's medical record. Id. at 6.

In contrast, the conversation here was not undertaken by Force on her own initiative for any particular purpose. It was, instead, initiated by Nurse Upson, who was seeking emotional support from her supervisor following a difficult shift.[9] Nurse Upson herself characterized the conversation as a "nurse-to-supervisor discussion in a safe place where I felt I could break down about the night before."[10] Even if Force followed up with questions aimed at identifying possible issues requiring the attention of the Quality Committee, the conversation was not confined to the object of quality assurance. Where Littleton Hospital would compare this conversation to the nurse epidemiologist's investigation in In re K, it more closely

---

[9] Plaintiffs' Mem. (doc. no. 20-1) at 5, 7 (quoting Upson Dep. 74:9-16, 78:19-21).

[10] Id. at 7 (quoting Upson Dep. 78:19-21).

9

resembles K's husband's report of conditions to the nurse epidemiologist, which spurred her investigation -- and which was not protected by the privilege. See In re K, 132 N.H. at 6.

Nor has Littleton Hospital established that Force was authorized to make such inquiries on the Quality Committee's behalf, either explicitly or implicitly. Though Littleton Hospital's Sentinel Event and Root Cause Analysis policy contains an affirmative delegation akin to the nurse epidemiologist's in In re K, it designates the hospital's Chief Administrative Officer to act on the Quality Committee's behalf. That designation does not include Force.[11] Littleton Hospital therefore argues that the conversation was privileged solely because "Force was specifically acting to carry out the Sentinel Event and Root Cause Analysis policy," which was approved by the Quality Committee.[12]

---

[11] Obj. Ex. A (doc. no. 22-2) ¶ III(I) ("The Quality Committee designates the Chief Administrative Officer to act on its behalf in the initiation, review and analysis of Root Cause Analyses/Sentinel Events.").

[12] Obj. (doc. no. 22) at 3. See also Bergen-Buteau Aff't (doc. no. 22-1) ¶ 9 ("Nurse Force was not conducting an individual inquiry into quality assurance when she spoke to Nurse Upson —- she was required by Hospital Policy to conduct a preliminary investigation to determine what next steps may be necessary in the quality assurance process, pursuant to a Hospital policy approved by the Quality Committee.").

10

Mere compliance with a policy "approved by" a quality-assurance committee does not, however, amount to affirmative delegation of authority under the statute or In re K. While internal policies may help the court determine whether a quality-assurance committee exists and whether an employee may act on its behalf, protection from discovery will not be extended to "all information," for example, simply because a policy states as much.[13] The statute and the New Hampshire Supreme Court's interpretation thereof, not the hospital's policy, delineate the contours of the privilege.

Even if such compliance with the policy constituted authorization, Force's obligations under the policy at the time that Nurse Upson sought to unburden herself do not implicate the express, statutorily-defined function of a quality-assurance committee's protected activities -- that is, "evaluat[ing] matters relating to the care and treatment of patients or to reduce morbidity and mortality." N.H. Rev. Stat. Ann. § 151:13-a, II. Seeking to establish that her activities implicated this function, Littleton Hospital contends that the Quality Committee authorized Force's inquiry because, by questioning Nurse Upson about Prezlie's delivery, she complied with the policy's

---

[13] Obj. Ex. A (doc. no. 22-2) ¶ III(J) ("All information will be considered protected from discovery as part of the quality review process of the hospital.").

11

requirement that immediate supervisors "[i]nvestigate and verify that a Sentinel Event or potential Sentinel Event has taken place."[14] The same policy, however, also places the responsibility for "identify[ing] suspected or identified Sentinel Event[s]" on "[a]ll [p]ersonnel"[15] and provides that, "[w]hen an adverse outcome or Sentinel Event is identified or suspected, the staff person(s) involved must immediately notify their immediate supervisor."[16] In light of this broad distribution of responsibility for identifying and reporting Sentinel Events, if compliance with this provision of the policy alone sufficed to authorize the hospital's employees to "act on behalf of" the Quality Committee, virtually every conversation between hospital employees about a Sentinel Event, whether actual or potential -- including even conversations between lower-level personnel to ascertain the facts underlying an event to determine if such a reportable event took place -- would constitute an action of the Quality Committee and be protected from discovery. Such a broad interpretation of authority runs

---

[14] Obj. Ex. A (doc. no 22-2) ¶ IV(B)(1). The policy defines a "Sentinel Event" as "an unexpected occurrence or variation in procedure or technique involving death or serious physical or psychological injury that significantly delays healing process, or the risk thereof."

[15] Id. ¶ IV(A).

[16] Id. ¶ VI(A).

afoul of the "the general rule," specifically applied to the quality-assurance privilege by the New Hampshire Supreme Court, "that such privileges are to be narrowly construed." In re K, 132 N.H. at 13. It would broaden the statutorily-created quality-assurance privilege beyond what its language supports in that it would allow hospitals to craft "quality-assurance polices" that render confidential nearly all records and communications about adverse or potentially adverse events.

Since neither the statutory language nor the New Hampshire Supreme Court's pronouncements in In re K suggest the broad interpretation of the privilege advanced by the defendants, the question arises whether the facts of In re K allow an inference that the privilege applies here. They do not. In that case, the nurse epidemiologist was "a member of the [quality-assurance] committee in her own right" and was expressly "delegated immediate responsibility for the performance of [its] duties . . . ." In re K, 132 N.H. at 14. Force, on the other hand, was not a member of any constituted quality-assurance committee at the time of her conversation with Nurse Upson. Littleton Hospital has not asserted that Force was, at the time, a member of the Quality Committee itself, which "has the responsibility for oversight of the Sentinel Event/Root Cause

Analysis process and its investigation of mortality/morbidity."[17] Though she may subsequently have become a member of the Sentinel Event Review Team for this event,[18] Littleton Hospital conceded at oral argument that such a team had not yet been constituted at the time of Force's conversation with Nurse Upson. Force's subsequent participation in the Sentinel Event Review Team's activities does not retroactively protect her conversation with Nurse Upson, held at a time when Force was neither a delegate nor a member of the team or of the Quality Committee.

The limited nature of Force's responsibilities under the policy as a <u>potential</u>, but not yet actuated, member of the Sentinel Event Review Team further indicates that she was not "immediately responsible" for that committee's duties, as the nurse epidemiologist was in In re K. The latter had immediate responsibility for the Infections Committee's duties when she

---

[17] Obj. Ex. A (doc. no. 22-2) ¶ IV(G).

[18] Pursuant to the policy, "[a]ny event that appears that it is going to result in serious injury or disability must be reported to the Chief Executive Officer (or Administrator on Call) and the Chief Administrative Officer/Risk Manager as soon as there is knowledge of the event occurring." Id. ¶ III(C). That officer then "make[s] the determination after any preliminary investigation of an event being a probable Sentinel Event . . . ." Id. ¶ III(D). Once that determination is made, that officer "will arrange a Sentinel Event Review Team meeting. The meeting will include the staff involved in the event." Id. ¶ VI(B); see also id. ¶ IV(D)(4) (members of a Sentinel Event Review Team include "other staff involved in occurrence as appropriate and at the discretion of the team leader").

14

was explicitly charged with investigating "the origins of infections that might arguably have been communicated within the hospital." In re K, 132 N.H. at 6. Her activities were for the "purpose of analyzing prior treatment for the sake of understanding the hospital's practices and judging their quality." Id. at 13. In contrast, at the time Nurse Upson sought her out and unburdened herself, Force was not, as the Sentinel Event Review Team would be, responsible for searching for "contributing factors" or "factors fundamentally responsible for the event."[19] In fact, there is no evidence before this court that Force was even aware of the event before Nurse Upson sought her out following the delivery. Force was required only to "investigate and verify that an event occurred and notify the Chief Executive Officer (or Administrator on Call) and the Chief Administrative Officer/Risk Manager immediately."[20] That obligation only arose once Nurse Upson had notified her of the event. More importantly, that undertaking -- verifying an event's occurrence and notifying the appropriate authorities -- precedes any action by the Sentinel Event Review Team (which had not yet been constituted) or the Quality Committee under the

---

[19] Id. ¶ VI(D).

[20] Id. ¶ IV(B).

terms of the policy. Force could not, therefore, have undertaken the conversation on either committee's behalf.

**IV. Conclusion**

The contours of the quality-assurance privilege are defined by statute, as interpreted by the New Hampshire Supreme Court, not by Littleton Hospital's internal policy. Force's conversation with Nurse Upson does not amount to a record of or testimony before a quality-assurance committee, under either the statute or the Court's extrapolation in In re K, regardless of her compliance with Littleton Hospital's internal policy -- which would not render the conversation privileged even if it controlled. Newland's motion to compel answers to questions regarding the content of Nurse Upson's conversation with Force[21] is, therefore, GRANTED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: December 14, 2017

cc: Todd D. Schlossberg, Esq.
    Michael F. Hanley, Esq.
    Gregory G. Peters, Esq.
    Pierre A. Chabot, Esq.

---

[21] Doc. no. 20.

16